IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JOHN WESLEY WILLIAMS,

        Plaintiff,                      No. CIV S-07-0211 JAM EFB P

    vs.

S. KERNAN, et al.,

        Defendants.           FINDINGS AND RECOMMENDATIONS

                              /

        Plaintiff is a state prisoner proceeding without counsel in an action brought under 42 U.S.C. § 1983. Currently before the court is defendants' December 2, 2008, amended motion for summary judgment.[1]

        Plaintiff's January 31, 2007, complaint claims that defendants Bailey, Vance and Vasquez removed him from the Enhanced Outpatient Program, a mental health service program

---

[1] Defendants initially filed a motion for summary judgment on March 7, 2008, to which plaintiff opposed on July 7, 2008. On September 30, 2008, however, the court extended the discovery deadline and denied defendants' motion without prejudice to its renewal or to the filing of an amended motion for summary judgment. The court further directed that plaintiff was granted leave to file an amended opposition brief or renew the one previously filed by filing a notice of such renewal. In accordance with the court's order, defendants filed an amended motion for summary judgment, and plaintiff filed a notice of renewal of his previously filed opposition brief, along with a supplemental opposition brief. Defendants did not file a reply brief.

1

at California State Prison, Sacramento, in retaliation for having filed numerous inmate appeals and for assisting other inmates in doing the same. Plaintiff also claims that defendant Hernandez filed a false disciplinary report against plaintiff in retaliation for having filed an inmate appeal against Hernandez. As explained below, plaintiff has failed to present evidence sufficient to show a genuine issue of material fact and defendants' motion must be granted.

**I   Facts**

The following facts are undisputed, except as noted below.

### A.   Mental Health Classifications

Inmates housed within the California Department of Corrections and Rehabilitation ("CDCR") who are diagnosed as suffering from a mental illness are evaluated and classified according to their mental health needs. Defs.' Am. Mot. for Summ. J., Stmt. of Undisp. Facts in Supp. Thereof ("SUF") SUF 1. CDCR has four levels of mental health treatment, which include, from the lowest level of mental health treatment to the highest, the Correctional Clinical Case Management System ("Case Management System"), the Enhanced Outpatient Program, the Mental Health Crisis Bed ("Crisis Bed"), and the California Department of Mental Health. SUF 2, 9, 14, 19, 24. The appropriate level of care for an inmate is based upon his level of functioning. SUF 4. An inmate's level of functioning is determined by the severity of his symptoms, his ability to conduct self-care, his ability to participate in activities of daily living, and his general adaptation to the prison environment. SUF 5. Furthermore, an inmate's level of functioning is measured by his Global Assessment of Functioning ("GAF) score. SUF 6. The GAF is a numeric scale (0 through 100) that rates a person's social, occupational and psychological functioning. SUF 7. An inmate's GAF score is estimated by the inmate's clinical case manager, who is typically a psychologist or psychiatric social worker. SUF 12. The score is a subjective determination representing "the clinician's judgment of the individual's overall level of functioning."  SUF 8.

////

The first, least severe level of mental health care, is the Case Management System. SUF 9. Inmates who receive active treatment for a mental illness, and are able to live within the general prison population, fall within this category. SUF 10. Inmates in the Case Management System will have a GAF score of 50 and above. SUF 13. The next level of care is the Enhanced Outpatient Program, which is designed to be a short-term program for inmates that need a structured clinical program with separate housing. SUF 14, 15. The goal of the Enhanced Outpatient Program is to provide focused evaluation and treatment, and return the inmate-patient to a mental state where he is able to function in the general prison population. SUF 17. Inmates in this category will have a GAF score of 30 to 49. SUF 18. The third level of care is the Crisis Bed, where patients in crisis can stay for a ten day maximum. SUF 19, 20, 21. A Crisis Bed inmate will have a GAF score of 30 or below. SUF 23. Inmates at the fourth level, the California Department of Mental Health, will also have a GAF score of 30 or below, and receive 24 hour nursing and psychiatric care in a hospital setting. SUF 25, 26.

**B. Changing an Inmate's Classification**

From the Case Management System, an inmate may move up a level to the Enhanced Outpatient Program or to the Crisis Bed, with only a recommendation from his clinical case manager and his treating psychiatrist. SUF 27. To move down from the Enhanced Outpatient Program to the Case Management System, however, that inmate's clinical case manager and the treating psychiatrist must recommend that he be considered for a transition, and that recommendation must then be approved by the Interdisciplinary Treatment Team ("Treatment Team"), which is a group of clinicians that decides an inmate's treatment needs. SUF 28, 30. Custody staff will participate in a Treatment Team meeting only for the purpose of informing clinical personnel of the inmate's program compliance, and other custody related observations. SUF 29. All decisions regarding mental health placement are clinical decisions and must be made by a mental health professional. SUF 32. Custody staff may not change an inmate's level of mental health treatment. SUF 31.

### C. The Enhanced Outpatient Program

Plaintiff arrived at California State Prison, Sacramento in December, 2004, and was assigned to the Case Management System level of care. SUF 37. From December 2004 until June 2005, Dr. Dina Botello, a psychologist, was plaintiff's clinical case manager. SUF 38. Following a "suicide gesture" in which plaintiff used his fingernails to cut his wrists, breaking the skin, Botello sent him to the Crisis Bed level of care. Defs.' Am. Mot. for Summ. J., Ex. B, Decl. of D. Botello in Supp. Thereof, ¶ 5. Plaintiff was discharged from the Crisis Bed to the Case Management System and then back to the general population, where his GAF score was 55. Botello Decl., at ¶ 6. Although Botello thought plaintiff was a high-functioning inmate, meaning that his GAF score was consistently at 50 and above, he was having temporary difficulty in the general population, so she recommended that he be placed in the Enhanced Outpatient Program, expecting that it would be for a short period of time. *Id.* at ¶ 8. Defendant Vasquez was the supervisor and senior psychologist of the Enhanced Outpatient Program. Defs.' Am. Mot. for Summ. J., Ex. D, Decl. of M. Vasquez in Supp. Thereof ¶ 1.

Once plaintiff was placed in the Enhanced Outpatient Program, Dr. K. Morgan, a senior psychologist, became plaintiff's clinical case manager. SUF 40; Defs.' Am. Mot. for Summ. J., Ex. C, Decl. of K. Morgan in Supp. Thereof ("Morgan Decl.") ¶ 1. On June 10, 2005, Morgan interviewed plaintiff, and spoke to him about his suicide gesture. SUF 41. Plaintiff told her that two weeks earlier he "tried to take [his] vein out of [his] arm" because he believed that the custody staff did not like him in C facility because he filed legal actions while housed there. Morgan Decl. ¶ 5. Morgan assessed plaintiff's GAF score at 40 based upon his self-report, and Morgan's clinical observations that indicated major impairment in functioning in the areas of judgment, thinking and mood. *Id.* at ¶ 6. Specifically, plaintiff exhibited stuttering speech, poor eye-contact, "downcast affect," and paranoia. SUF 42; Morgan Decl. ¶¶ 6, 7. Plaintiff also reported several symptoms of serious depression, namely inability to concentrate, which was negatively impacting his ability to do legal work, insomnia, and continued suicidal ideation, but

4

without a plan or intent to follow through with any suicide attempt. Morgan Decl. ¶ 6. Morgan believed plaintiff's suicide gesture was his method of coping with plaintiff's perception that custody staff on C-yard would harm him due to their dislike of his frequent legal actions. *Id.*

### D. Plaintiff's Inmate Appeals

Upon entering the Enhanced Outpatient Program, plaintiff began assisting other inmates in preparing inmate appeals. Pl.'s Opp'n to Defs.' Am. Mot. for Summ. J., Stmt of Disp. Facts in Supp. Thereof ("Pl.'s Opp'n, SDF") at II, ¶ 1. Plaintiff also filed his own inmate appeals. *Id.* at ¶ 5. The inmate appeals were forwarded to defendant Vance, a correctional captain in the Enhanced Outpatient Program, for disposition. *Id.* at ¶ 2; Defs.' Am. Mot. for Summ. J., Ex. E, Decl. of Vance in Supp. Thereof, ¶ 1. Plaintiff claims that on October 7, 2005, Morgan advised him that defendants Bailey, Vance and Vasquez wanted plaintiff removed from the Enhanced Outpatient Program because plaintiff's "processing of a lot of paperwork" meant that he was highly functional. Pl.'s Opp'n, SDF at II, ¶ 6. According to plaintiff, Morgan also informed him that the decision to remove him from the Enhanced Outpatient Program was coming from "higher up" than herself. Compl. ¶ 24. In response, plaintiff wrote to each defendant regarding their alleged plan to bar him from the program. Pl.'s Opp'n, SDF at II, ¶ 7. Thereafter, Vance purportedly advised plaintiff that his "paperwork" is creating "controversy" and that Vance did not want him in the program. *Id.* at ¶ 9.

### E. Plaintiff's GAF Score Improves

By July 29, 2005, plaintiff's GAF score had risen to 48, based upon his improvements in speech quality, concentration, sleep, and cessation of suicidal ideation. SUF 49. Nearly one month later, on August 26, 2005, plaintiff's GAF score remained at 48, as he was maintaining his improved level of functioning. SUF 53, 54. Several days later, on August 29, 2005, Morgan assessed plaintiff's GAF score as 49, because plaintiff appeared to be improving and stabilizing, his thinking was future-oriented, and not dominated by concerns about custody staff, he was getting along well with his cellmate, and his vegetative signs (i.e., sleep, appetite, concentration,

5

1  etc.) remained within normal limits. SUF 59; Morgan Decl. ¶ 10. By September 16, 2005,
2  Morgan determined plaintiff's GAF score had improved to 50 because plaintiff's behavioral
3  indicators (i.e., attitude, general appearance, speech and physical mannerisms) were within
4  normal limits, cognition (including attention, concentration, insight and judgment) were within
5  normal limits, vegetative signs were within normal limits, and plaintiff denied any suicidal
6  ideation. SUF 61. As of September 23, 2005, plaintiff's GAF score remained at 50. SUF 66.
7  On September 29, 2005, Morgan met with plaintiff and based on this meeting, his appearance,
8  his communications, and his ability to put his frustrations into writing, Morgan determined that
9  his GAF score was 55. SUF 71. Plaintiff and Morgan met again on October 7, 2005 and Morgan
10 determined that his GAF score remained at 55. SUF 75. Morgan's clinical notes reflect that as
11 early as August 2, 2005, and periodically thereafter, she opined that plaintiff should prepare for a
12 level of care change to the Case Management System in the near future. Morgan Decl., Ex. 1
13 (copy of notes dated August, 2, 2005, August 19, 2005, September 23, 2005, September 29,
14 2005); SUF 32, 62, 67 (referencing August 26, 2005, September 16, 2005, and September 28,
15 2005 notes, respectively).

### F. Plaintiff's GAF Score Worsens

During their October 20, 2005 meeting, plaintiff told Morgan that defendant Bailey, a correctional counselor within the Enhanced Outpatient Program, had advised plaintiff that he had suggested, and the Treatment Team had agreed, that plaintiff should be transferred out of the Enhanced Outpatient Program to the Case Management System. SUF 78; Defs.' Am. Mot. for Summ. J., Ex. F, Decl. of Bailey in Supp. Thereof, ¶ 1. Plaintiff demonstrated a resurgence of paranoia regarding custody staff and his belief that they were conspiring against him due to his filing of legal actions. SUF 78. However, rather than expressing a more generalized paranoid ideation as he had during his first weeks in the Enhanced Outpatient Program, he now focused his anger toward specific custody and clinical staff. SUF 79. Morgan determined his GAF score at 54, based upon the resurgence of plaintiff's paranoia, seemingly due to the intensity of his

anger resulting from Bailey's reported comment.  SUF 80.  Morgan did not reduce it further because, despite plaintiff's anger and apparent paranoid ideation, he denied any suicidal and/or homicidal ideation at the time.  SUF 80.

On October 22, 2005, plaintiff was admitted to the Crisis Center for suicidal ideation. SUF 81.  Two days later, plaintiff returned to the Enhanced Outpatient Program and reported to Morgan that he believed that the decision to remove him from the Enhanced Outpatient Program was not based on his actual mental health progress, but was a conspiracy somehow dictated by custody staff and benefitted those he had filed grievances against.  SUF 84.  Morgan assessed his GAF score at 45 based on his brief placement in the Crisis Bed two days earlier, and because he was still experiencing some suicidal ideation but without either plan or intent to actually do harm to himself.  SUF 85.

Morgan and Vasquez met with plaintiff on October 25, 2005.  SUF 86.  Plaintiff expressed his belief that defendant Vance had initiated plaintiff's transfer.  Morgan Decl., Ex. 1 (copy of Dr. Morgan's notes, dated October 25, 2005).  Vasquez assured plaintiff that the decision to transfer him was a clinical decision that is made by clinical staff.  *Id.*  After their discussion, plaintiff seemed to accept that the decision to transfer him had actually been based on his current mental health.  SUF 86.

**G. Plaintiff's Transition out of the Enhanced Outpatient Program**

On November 10, 2005, Morgan determined plaintiff's GAF score at 55 based upon his speedy rebound from a brief recurrence of suicidal ideation and his demonstrated improvement in coping skills for handling such thoughts when they occur.  SUF 90.  An inmate who has a GAF score of 50 and above is not an appropriate candidate for the Enhanced Outpatient Program because the program is designed for inmates who are not able to function in a general population setting, most times, temporarily.  SUF 95.  Clinically, when an inmate is at a GAF of 50 and above, being surrounded by inmates who are not able to function in a general population setting, inmates that are 49 and below, may negatively impact his mental health, and may contribute to

deterioration. SUF 97. Because of this, it is in the best interest of the inmate that for scores at GAF 50 and above, an inmate be in the general prison population rather than in the EOP. SUF 98.

On November 16, 2005, Morgan and plaintiff attended a Treatment Team meeting, which consisted of sixteen members, including five Ph.Ds, one medical doctor, six other health care professionals, and four custody staff members, including Bailey, Vance and Vasquez. SUF 91. The Treatment Team determined plaintiff's GAF score was 55 based upon Morgan's recommendation and analysis, including her input that he had made significant gains in coping skills and overall stability of mental health, such as resumption of positive future- and goal-oriented planning and execution in day-to-day living activities. SUF 93. At the meeting, Morgan recommended, and the Treatment Team decided through consensus, to change plaintiff's level of care from the Enhanced Outpatient Program to the Case Management System. SUF 92.

Morgan asserts that her evaluations and opinions of plaintiff during the course of her treatment were never influenced by whether he filed prison grievances, by opinions or custody staff members, or by her supervisor, Vasquez. SUF 99.

**H. Plaintiff's Claim Against Defendant Hernandez**

Plaintiff claims that on November 4, 2005, plaintiff informed defendant Hernandez, a correctional officer, that he was not getting along with his cellmate. SUF 104; Defs.' Am. Mot. for Summ. J., Ex. G, Decl. of Hernandez in Supp. Thereof, ¶ 1. As soon as Hernandez left plaintiff's cell door, a verbal and physical confrontation erupted between plaintiff and his cellmate. SUF 106. Hernandez activated his alarm and both inmates were escorted out of the cell and taken to be examined by medical personnel. SUF 108. Plaintiff claims that he told Hernandez that he intended to file an inmate appeal against him for failing to protect plaintiff from violence, and that Hernandez allegedly responded that he would issue plaintiff a rules violation report to protect himself. SUF 109, 110.

////

When a correctional officer witnesses a fight, an imminent fight, or if it appears to that correctional officer that a fight has just taken place, that correctional officer is required to write an incident report and give that report to a supervisor. SUF 100, 101. A correctional officer that witnesses any one of these situations does not have the authority to decide whether to compose a report. SUF 102. He must compose an incident report. SUF 103.

On November 4, 2005, Hernandez composed a report documenting his observations of the cell fight and presented the report to his direct supervisor. SUF 111. Based on this report, Hernandez's supervisor decided to charge both inmates with violating prison rules, and specifically, "conduct that could lead to violence." SUF 112. One week later, Hernandez was presented with two Rule Violation Reports, one for plaintiff and one for plaintiff's cellmate, including the verbatim text from Hernandez's November 4, 2005 incident report. SUF 114. Both inmates were issued a rules violation report for "conduct that could lead to violence." SUF 115. Plaintiff received his on November 14, 2005. SUF 117. Plaintiff composed an inmate grievance against Hernandez, which was dated November 11, 2005, but was stamped "Received" by the Appeals Coordinator's Officer on November 17, 20005. *Id.*

## II.     Summary Judgment Standards

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations omitted).

Summary judgment avoids unnecessary trials in cases with no genuinely disputed material facts. *See Northwest Motorcycle Ass'n v. United States Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). At issue is "whether the evidence presents a sufficient disagreement to

9

require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Thus, Rule 56 serves to screen the latter cases from those which actually require resolution of genuine disputes over material facts; *e.g.*, issues that can only be determined through presentation of testimony at trial such as the credibility of conflicting testimony over facts that make a difference in the outcome. *Celotex*, 477 U.S. at 323.

Focus on where the burden of proof lies as to the issue in question is crucial to summary judgment procedures. "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id.* Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See id.* at 322. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323.

If the moving party meets its initial responsibility, the opposing party must establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To overcome summary judgment, the opposing party must demonstrate a factual dispute that is both material, i.e. it affects the outcome of the claim under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987). In this regard, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. In attempting to

establish the existence of a factual dispute that is genuine, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. *See* Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586 n.11. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631.

Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments). However, the opposing party must demonstrate with adequate evidence a genuine issue for trial. *Valandingham v. Bojorquez*, 866 F.2d 1135, 1142 (9th Cir. 1989). The opposing party must do so with evidence upon which a fair-minded jury "could return a verdict for [him] on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 252. If the evidence presented could not support a judgment in the opposing party's favor, there is no genuine issue. *Id.*; *Celotex Corp. v. Catrett*, 477 U.S. at 323.

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. *See Anderson*, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. *See Matsushita*, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

On July 9, 2007, the court advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), *cert. denied*, 527 U.S. 1035 (1999), and *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988).

### III.  Analysis

Here, plaintiff sues under 42 U.S.C. Section 1983 on the ground that defendants retaliated against him for exercising his First Amendment rights. To prove retaliation, plaintiff must show that a state actor took some adverse action against him because of his protected conduct, and that such action chilled the inmate's exercise of his First Amendment rights and did not reasonably advance a legitimate penological purpose. *See Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005); *Barnett v. Centoni*, 31 F.3d 813, 815-16 (9th Cir. 1994) (per curiam). Inmates have a First Amendment right to file prisoner grievances to address issues related to their confinement, and they may not be punished for exercising that right. *Bradley v. Hall*, 64 F.3d 1276, 1279 (9th Cir. 1995). However, the principle works in tandem with the principle that institutional order and discipline are legitimate penological goals. *Rizzo v. Dawson*, 778 F.2d 527, 532 (9th Cir. 1985).

Plaintiff claims that defendants Bailey and Vance, custody staff, and Vasquez, Senior Psychologist, removed him from the Enhanced Outpatient Program in retaliation for plaintiff's use of the inmate appeal process. Plaintiff claims that defendant Hernandez issued plaintiff a false rules violation report in retaliation for having filed an inmate appeal against Hernandez. Defendants argue that they are entitled to summary judgment because no genuine issue of material fact exists that would require resolution by a fact-finder. Alternatively, defendants argue they are entitled to qualified immunity. As explained below, the court finds plaintiff has failed to present evidence sufficient to establish a genuine dispute over any material issue of fact and simply cannot prove the essential elements necessary to prevail in his First Amendment

retaliation claims. Accordingly, defendants are entitled to summary judgment and the court need not reach the alternative argument regarding qualified immunity.

**A. Claims Against Defendants Bailey, Vance and Vasquez**

Plaintiff submits evidence that defendants Bailey, Vance and Vasquez instructed Morgan to remove plaintiff from the Enhanced Outpatient Program because these defendants concluded that plaintiff was highly functional, given his ability to process "a lot of paperwork," such as inmate appeals. Pl.'s Opp'n, SDF at II, ¶ 6. Plaintiff also submits evidence that Vance wanted plaintiff removed from the Enhanced Outpatient Program because of his legal actions. *Id.* at ¶ 9. However, plaintiff fails to show that defendants were the cause of his removal from the Enhanced Outpatient Program. It is undisputed that by November 16, 2005, plaintiff had made significant gains in coping skills and the overall stability of his mental health. SUF 93. Based upon those gains, as analyzed by Morgan, the Treatment Team determined that plaintiff's GAF score was 55.[2] *Id.* Morgan, as plaintiff's treating mental health clinician, recommended to the Treatment Team that plaintiff's level of care be changed, and the Treatment Team approved that decision. *See* SUF 52, 63, 67, 87, 89 92. Defendants comprised only three of the sixteen member Treatment Team. SUF 91.

Moreover, an inmate's ability to communicate his desires in writing may be used as part of the behavioral information utilized clinically for determining an inmate's GAF score, as it demonstrates the inmate's ability to express anger and frustration in a way that is positive and

---

[2] Plaintiff argues that the GAF scores, as determined by Morgan, are inconsistent with Morgan's own medical notes. Pl.'s Supp. Opp'n to Defs.' Am. Mot. for Summ. J., Mem. of P. & A. in Supp. Thereof ("Pl.'s Supp'l Opp'n, P. & A.") at 6-7; *see also* Pl.'s Opp'n, P. & A. in Supp. Thereof at 9, Ex. C at unnumbered page 1 (regarding Treatment Team's November 16, 2005 determination of plaintiff's GAF score and reference to "delusion"); Pl.'s Supp'l Opp'n, P. & A. at 10-11, Ex. C at 1 (same). However, a patient's GAF score is a subjective determination representing the clinician's judgment of an individual's overall level of functioning. SUF 8. Morgan's assessments of plaintiff's GAF score while in the Enhanced Outpatient Program are well documented and based upon plaintiff's self reports and Morgan's observations and judgments. SUF 99. Plaintiff's lay opinion as to what his GAF scores should have been at any given time does not undermine the validity of the GAF scores as determined by Morgan. *See* Fed. R. Evid. 701, 702.

socially acceptable. SUF 94. Thus, while there are tones of irony from using the example of plaintiff's demonstrated abilities to present appeals as evidence of his level of functioning, Morgan's judgments regarding plaintiff's mental health appropriately considered plaintiff's ability to put his frustrations into writing. SUF 65, 71, 94. Assuming defendants intended to retaliate against plaintiff based upon plaintiff's protected conduct, there is no evidence showing that Morgan's analysis or recommendations regarding plaintiff's GAF score and mental health were influenced by those intentions.

Even if plaintiff were to demonstrate a prima facie showing of retaliatory motivation, defendants can prevail on summary judgment with undisputed evidence of a legitimate penological purpose for the adverse action. *See, e.g., Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977) (after plaintiff satisfies his burden of showing that defendant's conduct was motivated by plaintiff's constitutionally protected conduct, burden shifts to defendant to establish that the decision would have been no different even in the absence of the protected conduct). It is undisputed that housing an inmate who has a GAF score of 50 or above, with inmates who are unable to function in a general population setting, i.e., with GAF scores of 49 and below, may negatively impact the inmate's mental health and contribute to deterioration. SUF 97. It is in the best interest of the inmate that scores at GAF 50 and above to be in the general prison population rather than in the Enhanced Outpatient Program. SUF 98. Defendants have shown a legitimate penological justification for plaintiff's transition out of the Enhanced Outpatient Program, as plaintiff's GAF score at the time of his removal was 55, above that which is healthy for an inmate to remain in the program. *See* SUF 93, 98.

Plaintiff has failed to establish a triable issue of fact with respect to his retaliation claim against defendants Bailey, Vance and Vasquez. Therefore, these defendants are entitled to summary judgment.

////

////

### B. Claim Against Defendant Hernandez

Plaintiff alleges that Hernandez composed a rules violation report because plaintiff threatened to file an inmate grievance against Hernandez for failing to protect plaintiff from violence. Compl. ¶ 43. However, defendants have shown that there was a legitimate, penological reason for issuing the report. A correctional officer who witnesses a fight or a fight that has just taken place, is required to prepare a written report stating what was observed, and give that report to a supervisor. SUF 100, 101; *see also* Cal. Code Regs. tit. 15, § 3286. Here, plaintiff admits that he and his cellmate engaged in both a verbal and physical confrontation. Defs.' Am. Mot. for Summ. J., Ex. A at 91. Hernandez drafted a report stating that he heard arguing coming from plaintiff's cell, that he ran to the cell, and saw plaintiff and his cellmate standing in front of each other in a fighting stance. *See* Compl., Ex. I. Hernandez then gave that report to his supervisor. SUF 111. This is precisely what Hernandez was required to do. In short, the undisputed facts show that plaintiff got into a fight with his cellmate, Hernandez was required to report that fight, and Hernandez did, in fact, report it. Plaintiff has not shown that the rules violation report was composed by Hernandez for anything other than a legitimate penological reason, i.e., to maintain order and safety in the prison. Therefore, Hernandez is entitled to summary judgment.

### C. Qualified Immunity

Because the court resolves the summary judgment motion relating to the merits in favor of defendants, there is no reason to enquire further into an asserted defense of qualified immunity. *See Wilkie v. Robbins*, 551 U.S. 537 (2007).

### IV. Conclusion

For the reasons explained above, the court finds that there is no genuine dispute for trial with respect to plaintiff's retaliation claims.

////

////

Accordingly, it is hereby RECOMMENDED that:

1. Defendants' amended motion for summary judgment be granted;

2. Judgment be entered in favor of each defendant; and,

3. The Clerk be directed to close the case.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

Dated: September 4, 2009.

*[signature]*
EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE

16